## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 26 2020, 10:02 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brooke L. Scheurich
Rensselaer, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Natalie F. Weiss
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

E.W. and L.W. (Minor Children),

And

B.W. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 26, 2020

Court of Appeals Case No. 19A-JT-2499

Appeal from the Jasper Circuit Court

The Honorable John D. Potter, Judge

Trial Court Cause No. 37C01-1907-JT-102 & 37C01-1907-JT-103

**Riley, Judge**.

## STATEMENT OF THE CASE

Appellant-Respondent, B.W. (Mother), appeals the trial court's termination of her parental rights to her minor children, E.W. and L.W. (Children).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the Department of Child Services (DCS) presented clear and convincing evidence supporting the termination of the parent-child relationship.

## FACTS AND PROCEDURAL HISTORY

Mother and D.D. (Father)[1] are the biological parents to the Children, L.W., born on May 11, 2016, and E.W., born on August 20, 2017. L.W. was initially adjudicated a Child in Need of Services (CHINS) prior to E.W.'s birth, in which Mother admitted to battling a drug addiction for eight years. On August 21, 2017, both Children were removed from Mother's care due to allegations of abuse and neglect after E.W. tested positive for narcotics at birth and Mother tested positive for methamphetamines. E.W. could not breath at birth and had to be intubated. On October 17, 2017, after Mother admitted the allegations of

---

[1] Father voluntarily relinquished his parental rights and does not participate in this appeal.

the CHINS petition, the trial court adjudicated Children as CHINS and instituted a parental participation order, ordering Mother to, among others: engage in programs and assessments as directed by the Family Case Manager (FCM) and keep all appointments; complete a substance abuse assessment and follow all treatment recommendations; submit to random drug and alcohol screens; and maintain a safe and stable house and secure employment.

On December 12, 2017, Mother entered inpatient care at the Women's Bureau in Fort Wayne for a nine-month program of intensive drug treatment. While an inpatient, Mother had negative drug screens. She participated in visitation through Lifeline, and then started a trial home visit in April of 2018 in an apartment provided at the treatment facility, where Mother lived with the Children. On August 19, 2018, Mother discharged herself even though the program was not completed and moved to her grandmother's home with the Children. DCS performed a drug screen on Mother after she checked herself out of the facility and it was negative. Shortly thereafter, Mother obtained housing in Fort Wayne through the Fort Wayne Housing Authority. On September 12, 2018, Mother tested positive for methamphetamine and on September 17, 2018, E.W. tested positive for methamphetamine. The trial home visit ended on September 17, 2018.

After the trial home visit with the Children ended, Mother commenced substance abuse services at Park Center. She received three referrals for assessment, and on February 1, 2019, Mother failed to appear. On April 15, 2019, Mother completed her intake but failed to participate in any of the

recommended services. DCS made two referrals for inpatient treatment; however, these referrals were closed after Mother failed to comply. Mother was also referred to Park Center for medication management but was non-compliant. DCS made two referrals for Mother for mental health assessments on October 18, 2018 and again in March of 2019. While Mother completed the assessments, she became non-compliant when referred for a psychological examination.

[7] After the Children were removed on September 17, 2018, DCS re-started Mother's drug screens. Of the drug screens at the Women's Bureau, Park Center, and collected by DCS, Mother had 69 no-shows, 23 positive screens, 1 refusal, and 68 negative screens. Mother's 23 positive screens included positive results for methamphetamine, amphetamines, cocaine, heroin, morphine, and fentanyl. Her negative screens occurred mainly while she was an inpatient at the Women's Bureau. Mother's hair follicle screens were positive at 30, 60, and 90 days for methamphetamine, except for the last hair follicle screen on March 4, 2019, which was positive only at 60 and 90 days for methamphetamine.

[8] On April 30, 2019, the FCM visited Mother. During this visit, Mother passed out, nodded off twice, and passed out again while signing a consent form for a drug screen. Mother appeared pale, had open sores, and showed a lot of weight loss since January 2019. Mother claimed not have used any drugs since the trial home visit ended in September 2018.

[9]     DCS offered 62 visits with the Children of which Mother only attended 45. After the four-month trial home visit ended, DCS offered 43 visits. Mother attended 30, but during the period from April 11, 2019, through May 25, 2019, there were no visits as Mother failed to remain in contact with DCS for 6 weeks.

[10]    On April 19, 2019, Mother was charged with possession of methamphetamine and syringe offenses. At the June 4, 2019, child and family team meeting, Mother admitted to being an addict but denied using all of the drugs that appeared in the drug screens. She claimed to not have used opiates for several years. Three days later, on June 7, 2019, a police officer stopped Mother for driving a car with her driving privileges suspended. After a methamphetamine pipe and pills were located in the car, Mother was charged with maintaining a common nuisance, possession of a legend drug, and paraphernalia.

[11]    On July 3, 2019, DCS filed its petition for termination of Mother's parental rights. On September 6, 2019, Southlake Mental Health notified DCS that Mother had completed a fourteen-day inpatient program. On September 13, 2019, the trial court conducted a factfinding hearing on DCS's petition. At the time of the termination hearing, Mother had started participating in intensive outpatient program classes and Narcotics Anonymous meetings. On September 25, 2019, the trial court issued its Order, terminating Mother's parental rights and concluding, in pertinent part:

53. There is a bond between Mother and her [C]hildren.

54. Mother knows she needs to get clean for herself, let alone her [C]hildren.

55. Mother, although she appears to be on the right track at this eleventh hour, relies on different relatives for places to stay, transportation to treatment and classes and for all of her support. Mother is unable to support and take care of herself while she is currently pregnant, fighting for her sobriety and facing criminal charges in two counties.

56. Mother's claims of support from her family are more tangible at this time, as she can turn to her family for support instead of drugs; however, living with her family this past summer was when she was arrested in Lake County on felony drug charges.

57. Continuation of the parent-child relationship poses a threat to the well-being of the [C]hildren.

58. Mother, until the last few weeks before the termination, was testing positive for methamphetamine, fentanyl and other illegal narcotics.

59. Mother has two separate felony criminal drug cases pending in two different counties—Lake and Noble.

60. Visitation with Mother is going well, especially since the termination was filed, and the visitation supervisor recommends continued visitation.

61. Mother recently started mental health counseling on her own and as of September 6, 2019, the [DCS] was notified by Southlake Mental Health that Mother had completed a fourteen-

day inpatient program. Mother is still fighting and trying to treat her drug addiction problem.

62. The recent eleventh-hour actions of Mother to attend N.A., attend inpatient treatment at Southlake Mental Health with follow-up IOP care, attend visitations regularly, and communicate with her caseworker amount to "too little too late." The record of counseling and treatment followed by serious prolonged relapses are a much more reliable prognostication of Mother's behavior, which poses a threat to the [C]hildren's well-being.

63. Mother, except for this eleventh-hour attempt of self-treatment, has repeatedly denied or downplayed her drug use and addictions, which thwarted her recovery and sobriety.

64. Mother's use of fentanyl recently shows a danger to Mother's safety and health per the Park Center counselor. Fentanyl is a very hard opiate that indicates addiction is increasing.

65. There is a satisfactory plan of care and treatment for the [C]hildren. The [DCS] discussed adoption with Mother at the last two Child and Family Team Meetings. The current permanency plan was changed to adoption in July of 2019. The current placement with the pre-adoptive foster family is going very well for the [C]hildren.

66. Termination is in the best interests of the [C]hildren. Mother has continued to use illegal substances, was offered IOP in the first case, inpatient in the second case, and IOP in the second case, without success. Now Mother has two pending criminal cases for drugs and Mother overdosed at work in April of 2019.

67.  These two [C]hildren have had no permanency with Mother bouncing in and out of their lives between drug use relapses.  Her recent ditch efforts, *i.e.*, rehab and counseling, on her own do not outweigh the two years of conduct of Mother in this case.

(Appellant's App. Vol. II, pp. 193-95).

Mother now appeals.  Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I.  *Standard of Review*

Mother challenges the termination of her parental rights to her Child.  The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children.  *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).  "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'"  *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights."  *Id.*  If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate.  *Id.*  We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'"  *K.E. v. Ind. Dep't of Child*

*Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (quoting *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006)).

[14] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

## II. *Termination of Parental Rights Statute*

[15] In order to terminate a parent's rights to his or her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to be highly probable." *Id.*

A. *Conditions which Led to Removal*[2]

Mother's main claim is focused on the allegation that there is insufficient evidence to support the trial court's determination that the conditions which resulted in the removal of the Children have not been remedied. It is well established that "[a] trial court must judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d

---

[2] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21.

824, 828 (Ind. Ct. App. 1995), *trans. denied*. In judging fitness, a trial court may properly consider, among other things, a parent's substance abuse and lack of adequate housing and employment. *McBride v. Monroe Co. OFC*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may also consider a parent's failure to respond to services. *Lang v. Starke Co. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Stone*, 656 N.E.2d at 828. A trial court "need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id*. Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[17] In support of her argument that the conditions which resulted in the removal of the Children have been remedied, Mother refers to her voluntary inpatient enrollment at Southlake Mental Health and her participation in an intensive outpatient program after DCS filed its petition for termination of her parental rights.

[18] A trial court is "within its discretion to disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of

conduct prior to those efforts." *K.T.K.*, 989 N.E.2d at 1234. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Mindful of this guideline, we note that the evidence presented clearly and convincingly shows that a reasonable probability exists that the conditions that led to the Children's removal from Mother's care will not be remedied. Although Mother exhibited a recent turnaround in behavior the trial court was entitled to weigh the evidence as it found appropriate in the context of this case, and found that Mother's prior conduct was more telling than the efforts she exerted prior to the termination hearing. We agree.

[19] During the CHINS proceedings Mother used methamphetamine, amphetamines, cocaine, heroin, morphine, and recently, fentanyl. Of the drug screens collected at the Women's Bureau, Park Center, and by DCS, Mother either failed to appear, tested positive, or refused to test for approximately 58 percent of the tests. Mother's most recent drug screen, on July 15, 2019, was positive for methamphetamine and fentanyl, signaling an increase in Mother's drug abuse. Mother was recently charged with two drug-related offenses. Even during a home visit, the FCM observed Mother to be under the influence, as she passed out and nodded off. Even though Mother had a seemingly apparent period of sobriety while at the Women's Bureau from December 12, 2017 through August 19, 2018, the evidence actually indicates that Mother was using methamphetamine by June 2018 as Mother's September 2018 hair follicle test

tested positive for methamphetamine at the 90-day mark. DCS made two referrals for inpatient treatment; these referrals were closed due to Mother's non-compliance. She was referred to Park Center for medication management, but was not compliant.

[20] After the four-month trial home visit ended, DCS offered 43 supervised visits with the Children. Mother attended 30 visits but during the period from April 11, 2019 through May 25, 2019, there were no visits as Mother had failed to remain in communication with DCS.

[21] Mother now claims that the trial court should have taken into account the testimony of a therapist Mother worked with at Park Center. However, the trial court is not required to assess the same weight to the evidence as a party. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004). The trial court did not abuse its discretion in focusing on Mother's eight-year history of substance abuse and failure to engage in treatment, rather than on Mother's change in behavior after DCS filed its petition to terminate her parental rights. *In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997) (explaining that "it [is] within the province of the trial court, as the finder of fact, to ignore or discredit . . . evidence" of remedial efforts made shortly before the termination hearing). Accordingly, when considered as a whole, we find the evidence sufficient to demonstrate a reasonable probability that the conditions which resulted in the removal of the Children would not be remedied.

## B. *Best Interests of the Children*

[22]     Mother also challenges the trial court's conclusion that termination is in the Children's best interests. The premise of her argument focuses on the evidence that when visitation occurred, Mother's visits with her Children went well. The visitation reports were favorable and she interacted appropriately with the Children. To determine whether termination is in a child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. The court must subordinate the interests of the parents to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

[23]     Here, Mother was addicted to drugs and exposed the Children to drugs in the past. In fact, E.W. tested positive for narcotics at birth, had to be intubated, and again tested positive on September 17, 2018. Mother has pending criminal charges and recently overdosed at work in April of 2019. FCM stated that Mother is "using more drugs, she's showing that she's using more drugs to still get that high, than we were looking at the beginning of the case." (Transcript p. 86). FCM testified that L.W. has been in his Mother's care for thirteen months of his life, five months of which were the trial home visit, while E.W. has never been in Mother's care without DCS supervision. Mother cannot fulfill her parental obligations and is not able to provide a stable environment for the Children. While the Children's CASA testified that Mother is a very good parent and the Children are bonded with her, CASA recommended termination because "we're now three years and . . . I don't know in my own mind how

long it would take to ever know thoroughly that we could know that she's drug-free and be a safe situation for the" Children. (Tr. p. 128).

[24] The FCM testified that the Children are thriving in their foster care placement and that foster parents are willing to adopt them. The Children are bonded and enjoy permanency; "[t]ermination, allowing for a subsequent adoption, would provide them with the opportunity to be adopted into a safe, stable, consistent, and permanent environment where all their needs will continue to be met, and where they can grow." *In re A.D.S.*, 987 N.E.2d at 1159.

[25] Mother failed to avail herself of the opportunities and services offered by DCS to reunite with the Children and made no progress nor commitment during the proceedings of the case. While we are cognizant of the progress she made after DCS filed its petition for termination, it was too little, too late. We agree with the trial court's assessment that "the record of counseling and treatment followed by serious prolonged relapses are a much more reliable prognostication of Mother's behavior, which poses a threat to the [C]hildren's well-being." (Appellant's App. Vol. II, p. 194). "[C]hildren cannot wait indefinitely for their parents to work toward preservation or reunification." *In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014). Even though "the ultimate purpose of the law is to protect the child, the parent-child relationship will give way when it is no longer in the child's interest to maintain this relationship." *In re B.D.J.*, 728 N.E.2d 195, 200 (Ind. Ct. App. 2000).

Mother's historical inability to provide a suitable environment for the Children, together with her current inability to do the same, supports the trial court's conclusion that termination of her parental rights is in the best interests of the Children. Accordingly, we affirm the trial court's decision.

## CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's Order to terminate Mother's parental rights to the Children.

Affirmed.

Mathias, J. and Tavitas, J. concur